## Commonwealth *v*. Drum, Appellant.

*Criminal law—Conspiracy—Defrauding bank—Ability to repay.*

1. Where on the trial of an indictment for conspiracy to obtain the money of a bank by deceptive and unlawful means, the evidence is sufficient to establish the guilt of the defendant, the latter's ability to repay or even his intention to repay is immaterial.

*Evidence—Unsigned typewritten letter—Circumstantial evidence.*

2. Where the identity of an unsigned typewritten letter is in question and it is alleged that the letter was written by the cashier of a bank, the jury may pass upon the identity of the writer by considering the postmark, the indorsement of the name of the bank on the envelope, the letter-head showing the name of the bank and its officers, together with the fact that the subject of the letter was one peculiarly within the cashier's knowledge, and that he had a special motive for writing it.

Argued Dec. 13, 1909.  Appeal, No. 92, April T., 1910, by Frederick Ward, from judgment of Q. S. Washington Co., May T., 1909, No. 128, on verdict of guilty in case of Commonwealth v. C. H. Drum and Frederick Ward.  Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.  Affirmed.

Indictment for conspiracy.  Before TAYLOR, J.

At the trial A. B. Hay was asked this question:

"Q. Mr. Hay, you are a member of the Allegheny county bar?  A. Yes, sir.  Q. And have been for how many years? A. Forty-one years.  Q. I believe you are at present county solicitor?  A. Have been for three or four years, yes, sir. Q. Do you know Mr. Ward?  A. I do, sir.  Q. How long have you known him?  A. To the best of my recollection about five or six years.  Q. You are one of his counsel in this case?  A. Yes, sir.  Q. Have you been his personal counsel prior to this suit?  A. I think I have been, in all matters while he was at home, for the last—I would say four or five years.  Q. As counsel for Mr. Ward have you had knowledge in a general way of his business dealings?  A. I think so. Q. Are you able to state from your knowledge as his counsel as to the extent of his business dealings, and whether he has been engaged in various enterprises?  A. In quite a number——"·

Objected to as incompetent and irrelevant, and purpose asked for.

Mr. Irwin: It is preliminary to leading up to the question as to Mr. Ward's financial ability.

Mr. Underwood: We wish to have an offer made outside the hearing of the jury.

The following offer, objection and ruling were made outside the hearing of the jury:

The witness having stated that he was counsel for Mr. Ward and had been for a number of years, and in that way had learned of his business enterprises, the defendants' counsel propose to inquire of the witness as to his knowledge of the business in which Mr. Ward has been engaged in various en-

terprises, and of properties in which he is interested now and has been for a number of years, and the extent of his interests and property holdings, for the purpose of showing Mr. Ward's financial ability, to show that his credit was good and rested on substantial properties at the time he borrowed the money from the Coal Center Bank; and this in corroboration of the testimony already in the case as to the money having been loaned upon the good faith of Ward's ability to repay the money.

Objected to by the commonwealth for the reason it contains no offer to bring home knowledge to Drum of any ability that Ward might have to pay his loans; for the further reason that Ward's ability to pay what he owes the bank is not the question at issue, but whether he obtained the money in a fraudulent and a corrupt manner; and it is further objected to by reason of the fact that it would put upon the commonwealth the necessity of proving what Mr. Ward's indebtedness was and make this a long issue of finding out what he owned and what he owed.

The Court: The question at issue in this case is whether there was an unlawful combination between the defendants to do an unlawful thing in itself or a lawful thing in an unlawful manner, and as we view it we cannot see how the financial ability of one of the alleged coconspirators to pay money obtained out of this bank as claimed in an unlawful manner through the cashier—how the financial standing of one of them meets any question raised by the issue, and particularly so when the defendant already called upon the stand admits that the said Ward, about whom it is proposed to inquire as to his financial standing, owes the Bank of Coal Center and has owed it for some considerable time upwards of $65,000, and that this evidence of indebtedness is by notes that were discounted at the bank in the name of third parties and which Ward is in no way legally bound to pay, as would appear by the paper itself; and for the further reason that one of the alleged coconspirators upon the stand has admitted on cross-examination that after $15,000 of the paper was ordered charged off by the banking department

of the state and assumed by the directors and the resolution of the board of directors passed authorizing the cashier to accept no more paper from the said Ward in the manner heretofore discounted, it was notice to the cashier that this paper was not regarded by the bank, with the securities offered, collateral pledged, as sufficient security for these loans, and that this practice must discontinue—that in the face of this, the said Drum, the said alleged coconspirator, admitted upon the stand upon cross-examination that he continued said practice and accepted notes signed in this way by third parties, on which Ward's name did not appear and to which he could not legally be bound, and that the cashier accepted credits in this way to himself from this paper which he claimed the said Ward had owed him. So as the case stands on the undisputed testimony, we cannot see how the question of Mr. Ward's ability to pay these notes, when it is shown that they are not paid, is material in the issue, it being a charge of conspiracy. With these admissions of the defendant Drum on the stand on his cross-examination, as to continuing the practice of taking this paper from third parties, crediting amounts to himself and Ward and lifting other notes discounted for them in the names of third parties, the charging of $15,000 of this paper off by order of the banking department of the state, and the assumption of this amount by the directors of the bank and the further continuance of this practice by Drum in the absence of a resolution of the board of directors, the offer on the question of the financial ability of one of the coconspirators is immaterial to this issue. This offer, this objection and this ruling of the court made at request of counsel in private, and the offer is overruled, the objection sustained and an exception noted for the defendants and a bill sealed for the defendants. [1]

A. K. Young was asked these questions:

"Q. In April, 1908, did you know Mr. G. S. Hornbake, Jr., cashier of the bank? A. I guess about that time. Q. Did you ever have any communications from Mr. Drum in regard to any of these notes that you had got the signatures to or in regard to any of the people that you had gotten to

sign or indorse any of the notes?  A. I received a letter from Mr. Drum pertaining to the men I had on the notes.  Q. Do you remember when that was?  A. I can't give you the date."

(Letter and envelope marked exhibit "W.")

"Q. Mr. Young, did anyone connected with the Bank of Coal Center know that you were getting these people to make or indorse notes other than C. H. Drum?  A. I have no knowledge of them knowing it.  Q. And did anyone in Pittsburg know it except Mr. Ward and the men that you got to make or indorse the notes?  A. I don't believe they did. Q. I show you exhibit 'W,' Mr. Young, consisting of an envelope and a letter and ask you whether or not that is the communication you have testified to as having been received from Mr. Drum?  A. That is the letter I received from— Q. Where did you get that, Mr. Young?  A. At 612 Farmers' Bank Building through the mail.  Q. That is where your offices were at the time you received it?  A. Yes, sir.  Q. You received this through the mail?  A. Yes, sir."

Mr. Acheson: If the court please, in connection with the testimony of Mr. Young, we wish to offer in evidence exhibit ".W," consisting of an envelope and letter addressed to Mr. Young.

Mr. Bane: The offer is objected to for the reason that the paper or letter accompanying the envelope is not signed by any person, there is no proof of the writing, there is no proof that it was written by either of the defendants, and there is no proof that either of the defendants ever had any knowledge of its contents; and generally as irrelevant and immaterial.

The Court: We think the letter is competent to be introduced in evidence in connection with what has preceded it, the evidence already in the case.  The weight it is entitled to will be entirely for the jury, by reason of the letter being unsigned, and for them to say from the sheet of paper containing the note, and the contents, whether it relates to the transactions that are claimed by the commonwealth; and it is admitted with those remarks, and the objection is overruled and bill sealed for the defendants.

Mr. Acheson: The envelope, marked at the top in the left-hand corner, "In 5 days return to Bank of Coal Center, Coal Center, Pa." The date is partially obliterated,—"April 20, 1908—Pa.," and on the back, "Pittsburg, Pa., Received, April 20, 4 p. m., 1908. A. K. Young, Esq., Care of Frederick W. Ward, Farmers' Bank Building, Pittsburg, Pa." "Bank of Coal Center, Coal Center, Pa. Capital $50,000. R. B. Drum, President. G. S. Hornbake, Sr., Vice President. W. H. Gregg, Sr., Vice President. C. H. Drum, Cashier, G. S. Hornbake, Jr., Assistant Cashier. Coal Center, Pa., April 20, 1908. A. K. Young, Esq., Care of Frederick W. Ward, Farmers' Bank Building, Pittsburg, Pa. Dear Sir: Have all your men at Mr. Ward's office on Friday of this week to meet a committee from this bank. Be sure and tell them they must say that the notes are theirs, for if they don't they will get into a lot of trouble. I am depending on you to get this right and do not fail me. I will be in to see you before hand, but they must be there at two o'clock. Tell Lucas I want him to be there at that time but do not say what I want. Very truly yours." [4]

Verdict of guilty, upon which judgment of sentence was passed.

*Error assigned* were (1, 4) rulings on evidence, quoting the bill of exceptions.

*R. W. Irwin*, with him *A. B. Hay* and *James A. Wiley*, for appellant.

*Owen C. Underwood*, with him *C. L. V. Acheson*, district attorney, *T. H. W. Ferguson*, assistant district attorney, and *R. H. Meloy*, for appellee.

OPINION BY RICE, P. J., March 3, 1910:

The Bank of Coal Center, chartered under the laws of the state, began doing business in 1904, and closed its doors because of insolvency about September, 1908, at which time,

according to the allegation of the commonwealth, it had sustained a loss of from $60,000 to $65,000 through the transactions (hereafter described) of the appellant and Drum, the cashier of the bank, who were codefendants in the case out of which this appeal arose. The indictment charged that the defendants conspired, by false pretenses, subtle means and devices and by unlawful means and unlawful acts, to obtain and acquire to themselves the money of the bank. The undisputed testimony is that in 1905 Ward opened an account in the bank; that he and Drum became interested in the Standard Car & Foundry Company, of which the former became president and the latter treasurer; that in January, 1908, pursuant to notice from the state bank department, if not by its express direction, an indebtedness of $15,000 based on notes of Ward and the Standard Car & Foundry Company was charged off the books of the bank, because not properly secured, and assumed by the bank directors personally; that notwithstanding this fact and in face of the resolution of the board of directors and notice to Drum that no more loans be made without their approval, Drum and Ward continued the practice of obtaining the money of the bank by means of notes signed by residents of Pittsburg who were not responsible, but who executed the notes at the request of either Ward or Drum, or someone employed by them to obtain such signatures. Many of these notes when renewed were renewed for larger amounts than the original notes and many of them were signed by the third parties in blank, and the amounts were filled in by Drum when they were presented at the bank. None of the third parties signing the notes had anything to do with the transactions, except simply to sign their names to the notes or the renewals thereof, and did not receive any of the proceeds; they were mere tools of Ward and Drum. Those notes, or a majority of them, were in the bank and unpaid at the time it closed its doors, and represented a very large part of the $65,000 loss which brought the bank to insolvency. While Drum testified that Ward gave him an oral guaranty of the notes and that he believed him worth the amount, there was nothing on the face of the papers or the books of the bank to

show that they represented an indebtedness of Ward or that he was primarily or secondarily liable for them. The following extracts from the testimony of Drum throw light on the transactions: "State, Mr. Drum, whether Mr. Ward discounted any paper at your bank upon which he did not appear either as maker or indorser? Yes, sir; he did. Why was that? I wanted to keep Mr. Ward's credit down as low as possible, just like I like to keep anybody else's credit down. And what other matter with reference to the regularity of lending to one man more than a certain sum? I didn't want to loan vast amounts to one man." Upon cross-examination he testified: "And after the board of directors had passed a resolution that no more loans be made without their approval, you continued to let Ward put in paper there? Yes, after that resolution things went on in the bank just the same, and passed them." Again we quote from his cross-examination: "Mr. Drum, I understood you to say yesterday that the reason you had Mr. Ward put in the notes of other people instead of his own was to prevent the books showing that he was as large a borrower as he was, is that true? Yes, sir. That was the reason, was it? Yes, sir. You didn't want the books? It is customary with all banks to do that where they think the borrower is entitled to more credit than the extent of the bank capital permits him to have; it is customary to do that every day in all our banks,—don't know of one bank that don't do it. If this indebtedness to the bank was $65,000, that was $15,000 more than the full capital stock of the bank? Yes, sir." Further on in his cross-examination this testimony was given: "But did you not regard the passing of that resolution when you were present as notice to you that they didn't want any more loans made unless they were submitted to them? Yes, sir; I think so. And after that time you continued to make loans on paper which was furnished by Ward without submitting them to the directors? Yes, sir. And the directors, as a matter of fact, none of them, knew from anything you told them, who these men were whose notes were coming in after that, where Ward was really getting the money? No." It is thus seen that while the methods adopted by Ward and Drum

were not precisely the same as those alluded to in the opinion of our Brother HENDERSON in Com. v. Lenhart, 40 Pa. Superior Ct. 572, they were equally effective and as plainly intended to prevent the directors of the bank and the state banking department from acquiring information of the true condition of the bank's business, and, particularly, information of the large amount of the bank's money that went to Ward by connivance of Drum after the personal assumption by the directors of the $15,000 indebtedness in order to preserve the credit of the bank. That the methods were deceptive and unlawful can scarcely be disputed, and as was said in the case cited of the transactions of Lenhart and the cashier, so it may be said here, it is not pretended that there was not an understanding and agreement on the part of Drum and the defendant to adopt the method used by the latter in obtaining the money and postponing payment thereof. The issue, as presented when the offer embraced in the first assignment was made, was whether the defendants had conspired to obtain the money of the bank by deceptive and unlawful means, not whether they had conspired to obtain the money of the bank beyond the ability of Ward to repay or without an intention on his part to repay it. The defendant's offer to prove by his counsel "that his credit was good and rested on substantial properties at the time he borrowed the money from the Coal Center Bank" was not tantamount to an offer to prove his ability to repay the $65,000 and all his other indebtedness as well. But even if the offer had been broader and more explicit, there was no error in rejecting it, because the evidence would not have repelled the inference of any fact essential to his conviction of the conspiracy to obtain the money of the bank by deceptive and unlawful means. His ability to repay, or even his intention to repay, would not relieve him from answering the accusation which the commonwealth made: Com. v. Lenhart, supra.

Complaint is made in the fourth assignment of the admission of an unsigned typewritten letter to A. K. Young without sufficient preliminary proof, as claimed by counsel for the appellant, that it came from Drum. Before the admission of

this letter, Young had testified that at the request of Ward and
Drum he had obtained the signatures, either as indorsers or
makers, of persons financially irresponsible to many of the
notes above referred to; that at the time he obtained them the
notes were undated and the blank spaces for the amounts
were not filled; that he either mailed or delivered them to
Drum or delivered them to Ward to be delivered to Drum. He
testified further that he told Ward he did not like to be run-
ning after these men all the time for renewals; that it was an
embarrassing thing for him to do; that he thought these men
ought to be taken care of in a way, by "a little supper or
amusement of some kind or something similar to that;" and
that Ward told him he would have to see Drum about that.
Thereupon, he says, he wrote and mailed a letter to Drum
dated April 7, 1908. This was admittedly received and reads
as follows: "I have promised to pay Messrs. Connell, Burnett
and Davis the sum of ten dollars each for their signatures on
the note I sent to you last evening. I promised to do this be-
fore seven o'clock this evening. Have also made arrange-
ments to meet Maratta, McQuaide, Baker and Harris this
evening to get their signatures. I can do nothing further in
this matter unless I have the ammunition at hand." He fur-
ther testified that no one to his knowledge connected with the
bank excepting Drum knew that he was getting these people
to make or indorse notes. After this preliminary proof came
the admission of the unsigned typewritten letter of April 20,
1908, referred to in the fourth assignment. The body reads
as follows: "Coal Center, Pa., April 20, 1908. A. K. Young,
Esq., Care of Frederick W. Ward, Farmers Bank Building,
Pittsburg, Pa. Dear Sir: Have all your men at Mr. Ward's
office on Friday of this week to meet a committee from this
bank. Be sure and tell them they must say that the notes are
theirs; for if they don't they will get into a lot of trouble. I
am depending on you to get this right and do not fail me. I
will be in to see you beforehand, but they must be there at
two o'clock. Tell Lucas I want him to be there at that time
but do not say what I want. Very truly yours." There are
several features of this letter important to be noticed. The

envelope was post-marked at Coal Center, and in the upper left-hand corner were the printed words, "In 5 days return to Bank of Coal Center, Coal Center, Pa." The address on the envelope as well as at the head of the letter was, "A. K. Young, Esq., care of Frederick W. Ward, Farmers Bank Building, Pittsburg, Pa." The letter was written on paper bearing the printed or engraved letter head of the Bank of Coal Center, which set forth the amount of its capital stock and the names of the officers of the bank, including that of "C. H. Drum, cashier." It is also to be noticed that Drum admitted on cross-examination that a committee was appointed to go with him to Pittsburg to make investigation as to these notes. There being no testimony of any person that he saw Drum write or mail the letter or have it in his possession, or that Drum admitted to him that he wrote or mailed it or authorized it to be written or mailed, the commonwealth was necessarily compelled to rely on circumstantial evidence to show his connection with it. The postmark, the indorsement on the envelope and the letter head were circumstances tending in that direction. But as other persons had access to the stationery of the bank, they would not be conclusive, or even sufficient, standing alone, to sustain a finding that the letter came from Drum. But these circumstances do not stand alone. As shown by the foregoing recital of the evidence, the subject of the communication was one peculiarly within the knowledge of Drum, and he had a special motive, and, besides Ward, was the only person who had, to have the request of the communication carried out. Speaking of the subject of the contents of a written communication as evidence of authorship or responsibility for it, Professor Wigmore says: "But where the necessity above mentioned does in fact exist, namely, the impossibility of obtaining handwriting-testimony, it would seem to follow that resort must be had to the evidence from contents,—at any rate, in some circumstances or upon the facts of a particular case. Such an impossibility may exist for three sorts of writing, (a) an illiterate's writing by amanuensis, (b) a type-written letter, (c) printed matter:" 3 Wigmore on Evidence, sec. 2148. He then quotes from the opinion of NOTT, J.,

in Singleton v. Bremar, Harp., S. C., 201, 209: "The usual method of proving an instrument of writing, where there is no subscribing witness, is by proof of handwriting. But that could not be expected in this case, as the party cannot write. Even if her name had been subscribed to the letters, the difficulty would not have been lessened. Some other method must therefore be resorted to, and why may not the letters be looked into? If they furnish internal evidence of the source from whence they were derived, I can see no reason why we may not avail ourselves of that evidence. Thus, for instance, if they relate to facts which cannot be known to any other person, it will be presumed that they were written by her authority. If they embrace a number of facts which relate to her and her situation, and which cannot apply to any other person, each of those facts constitutes a link in the chain of circumstances which go to strengthen the presumption. In ordinary cases such evidence will not be allowed, because the writing is always presumed to be by the person by whom it purports to be written, and proof of the handwriting therefore is higher evidence. But in the present case the evidence offered was the best which the nature of the case could afford." The author then proceeds as follows: "The case of an amanuensis, using a typewriting machine, presents a similar impossibility, whenever the signature (as sometimes happens) is also typewritten or stamped; and it would seem that a similar necessity justifies a resort to evidence from contents." We of course do not say that the internal evidence is in all cases sufficient to carry the question to a jury, and it is doubtless true that there are some dangers of abuse from a resort to that kind of testimony, but there is also danger of abuse in the opposite direction; for the difficulty of authenticating such a document is sometimes taken advantage of by those who wish to be able to disavow their authorship. Each case must be judged by its special facts, and having regard to all of the extraneous circumstances to which we have alluded and the contents of the paper itself we are of opinion that the court committed no error in receiving it in evidence and submitting to the jury the question of Drum's connection with it.

We have discussed the two principal assignments of error and we have also fully considered the able arguments of counsel upon the other assignments. As we view the case it is unnecessary to say more regarding them than that we discover no error in the instructions and rulings complained of which would·justify a reversal of the judgment.

The judgment is affirmed, and the record is remitted to the court of quarter sessions of Washington county with direction that the judgment be fully carried into effect, and to that end it is ordered that the defendant forthwith appear in that court and that he by that court committed to serve and comply with such part of his sentence as had not been performed at the time the appeal was made a supersedeas.